SIEBE, INC. *vs.* LOUIS M. GERSON CO., INC.

No. 07-P-1500.

Norfolk. October 3, 2008. - June 30, 2009.

Present: TRAINOR, KATZMANN, & VUONO, JJ.

*Practice, Civil,* Summary judgment. *Conflict of Laws. Contract,* Construction
of contract, Parties, Performance and breach, Warranty. *Sale,* Warranty.
*Evidence,* Parol evidence, Extrinsic affecting writing. *Uniform Commercial
Code,* Sale of goods, Warranty. *Limitations, Statute of. Words,* "Claim,"
"Defend."

In a civil action alleging that the defendant (a manufacturer) had a contractual
duty to defend the plaintiff (a distributor and resaler) in connection with
three products liability lawsuits brought against the plaintiff, the trial court
judge erred in granting summary judgment in favor of the defendant,
where, under Rhode Island law, the plain and ordinary meaning of the
terms of the contractual provisions imposed on the defendant a duty to
defend the plaintiff in connection with certain alleged breaches covered
under the parties' commercial contract [548-552]; where the allegations in
the underlying lawsuits, although not very particular, fell within the cover-
age of the contract [552-556]; and where, contrary to the defendant's al-
legations, the Uniform Commercial Code statute of limitations applicable
to contract-based breach of warranty claims did not operate to bar the
plaintiff's timely action, which was based on the defendant's alleged
breach of its duty to defend [556-558].

CIVIL ACTION commenced in the Superior Court Department on
September 14, 2005.

The case was heard by *Thomas A. Connors,* J., on motions
for summary judgment.

*Jeffrey B. Renton* (*Matthew J. Ginsburg* with him) for the
plaintiff.

*John M. Connolly* for the defendant.

KATZMANN, J. Plaintiff-appellant Siebe, Inc. (Siebe), is appeal-
ing a Superior Court judge's grant of summary judgment to
defendant-appellee Louis M. Gerson Co., Inc. (Gerson), and the
denial of partial summary judgment to Siebe. The primary ques-

tion presented is whether under an agreement between them Gerson had a duty to defend Siebe in connection with three product liability lawsuits brought against Siebe. We also consider whether Siebe's cause of action was barred under the applicable statute of limitations.

*Background.* Gerson and North Safety Products (North), the predecessor of Siebe,[1] entered into a product sales agreement (PSA), effective May 1, 1996, for Siebe's distribution and resale of certain dust mist respirator masks manufactured by Gerson. The masks were approved by the National Institute for Occupational Safety and Health (NIOSH). The NIOSH approval regulations are codified in 42 C.F.R. §§ 84.1 et seq. (2008), providing, among other things, detailed instructions with respect to testing and inspection of respiratory devices such as the masks at issue.[2] After a respiratory device is approved and registered with NIOSH, the manufacturer must comply with ongoing inspection, testing, and quality control requirements, and if it fails to do so, NIOSH may revoke its approval. 42 C.F.R. §§ 84.42(c), 84.43(c).

The PSA contained the following provisions relating to warranty, cross-defense, and indemnification:

> 8c.(1): "Gerson warrants the masks to be (i) in compliance with the requirements of the applicable NIOSH and CEN[3] approvals, and (ii) free from defects in materials and workmanship as defined by Gerson's quality specifications detailed in its Quality Plan (which quality specifications have been accepted by North and will not be changed

---

[1]Prior to 1998, North was a wholly-owned subsidiary of Siebe. In 1998, North's shares were acquired by Norcross Safety Products LLC and North ceased to have any connection to Siebe. However, the terms of the sale required Siebe to retain liability for claims relating to products manufactured or sold prior to the sale. For purposes of this decision, Siebe and North are referred to interchangeably.

Siebe and Gerson each maintain their principal places of business in Massachusetts.

[2]In order to approve a respiratory device, NIOSH must review its design plans, drawings, specifications for construction, a proposed quality control plan, and prototypes, 42 C.F.R. § 84.11, and determine that the device has met the minimum requirements articulated in subpart K of 42 C.F.R. § 84.

[3]CEN is the European Committee for Standardization. CEN requirements are not at issue in this case.

therefrom by Gerson without North's prior written consent, which will not be unreasonably withheld). Gerson makes this warranty in lieu of the implied warranties of merchantability and fitness for particular purpose, and all other warranties, express or implied (except the implied warranties of title and against patent infringement, which are not disclaimed) and Gerson disclaims any warranty with respect to the adequacy of the instructions or warnings accompanying these masks. Gerson makes no warranties beyond those set forth in the Paragraph 8c.(1)."

8d.(1): "Gerson will defend, indemnify and hold harmless North, its affiliated companies and its distributors, from and against all claims, liabilities, demands, damages, losses, costs, expenses, reasonable attorneys' fees, awards, fines and judgments, at law or in equity, for personal injury, death, property damage and patent infringement, (collectively the 'Claims') arising out of any breach of any of the warranties specified in Paragraph 8c.(i) above. North will give Gerson prompt written notice of any Claim, and will give Gerson full authority, information and assistance (at Gerson's expense) for the defense and settlement of any Claim. North may, at its own cost and expense, participate in any suits, defense, or compromise or settlement effort with respect to any Claim."

8d.(2): "North will defend, indemnify and hold harmless Gerson and its affiliated companies from and against all Claims arising from any alleged inadequacy of the warnings or instructions accompanying the mask. Gerson will give North prompt written notice of any Claim, and will give North full authority, information and assistance (at North's expense) for the defense and settlement of any such claim. Gerson may, at its own cost and expense, participate in any suits, defense, or compromise or settlement effort with respect to any Claim."

Gerson manufactured and supplied masks to Siebe from late 1996 to early 2002. Between 2002 and 2004, Siebe was a subject of three separate product liability lawsuits (underlying lawsuits) brought by plaintiffs in Texas who alleged that they had been exposed to harmful substances in the workplace and had developed

silicosis despite using the masks. All three lawsuits contained similar claims for, among other things, manufacture and sale of defective respiratory equipment by Siebe and other companies (underlying lawsuit defendants)[4]; failure to properly test and inspect said equipment; and failure to issue proper warnings with respect to the equipment.[5] However, in none of these lawsuits did the plaintiffs specifically allege that the masks failed to conform to the NIOSH standards or to Gerson's quality plan specifications.

Dr. Behzad Samimi and Dr. Yehia Hammad provided expert opinions in the underlying lawsuits with respect to the plaintiffs' allegations.[6] Dr. Samimi testified at a deposition that the warnings on the masks were inadequate; that the usage of the masks was inappropriate and useless, and did not provide proper protection, given the plaintiffs' exposure to silica; and that the masks were defective in that they could not be fit-tested properly.[7] Dr. Hammad was designated to testify at trial regarding the underlying lawsuit defendants' lack of proper instructions and warnings with respect to proper use of the masks; lack of a proper quality

---

[4]Depositions of the lead plaintiffs were taken in each underlying lawsuit; during the depositions, the plaintiffs identified and claimed to have used masks manufactured by Gerson and sold by Siebe.

[5]Specifically, the plaintiff in the first action asserted, among other claims, that his silicosis resulted from the use of defective respiratory equipment; that the underlying lawsuit defendants were negligent in failing to provide proper warnings regarding proper protective equipment; that the defective condition of the respiratory devices rendered them unreasonably dangerous and ineffective for use as devices for protection against inhalation of silica; and that the underlying lawsuit defendants placed the masks in the stream of commerce without inspection for defects. The plaintiffs in the second action alleged that the respiratory products were defective at the time of their manufacture, distribution, and sale, and such defective condition caused injuries to the plaintiffs; the underlying lawsuit defendants instructed or recommended the use of such inappropriate and inadequate devices; the devices did not carry adequate and sufficient warnings and instructions; and the underlying lawsuit defendants failed to properly test their products. The plaintiffs in the third action alleged that the underlying lawsuit defendants failed to provide information regarding proper protective equipment; that there were no adequate warnings in place; that the manufacture and design of the products was improper and unsafe for use; and that the respiratory devices were not properly tested.

[6]Dr. Samimi was deposed and was designated to testify at trial. Dr. Hammad was designated to testify at trial.

[7]Additionally, Dr. Samimi was designated to testify at trial regarding inadequate warnings on the defendants' products as well as the defectiveness of the defendants' respiratory products, particularly the dust masks.

control program on manufactured dust respirators; and the ineffectiveness of dust respirators in protecting workers from silica exposures due to their defective design.

Siebe timely informed Gerson concerning the pendency of the underlying lawsuits; in its notifications, Siebe contended that Gerson's obligations under paragraph 8d.(1) of the PSA had been triggered by the underlying lawsuits.[8] Gerson never replied to any of the notices. On September 14, 2005, Siebe filed this action against Gerson seeking reimbursement of defense and indemnification costs it incurred in the underlying lawsuits. On June 19, 2007, the trial judge granted summary judgment to Gerson, and denied partial summary judgment to Siebe, concluding that the clear and unambiguous language of the PSA provisions at issue did not obligate Gerson to defend and indemnify Siebe in connection with the underlying lawsuits. On appeal, Siebe argues for reversal of the judgment as it applies to its claim that Gerson owed a duty to defend.

*Discussion.* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 553 (1976). The moving party bears the burden of proving that "there is no genuine issue of material fact on every relevant issue," even if it would not have that burden at trial. *Pederson* v. *Time, Inc.*, 404 Mass. 14, 17 (1989). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to show with admissible evidence a dispute of material fact. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711 (1991).

In sum, "[t]he standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Nelson* v. *Salem State College*, 446 Mass. 525, 530 (2006), quoting from *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117,

---

[8]Besides notifying Gerson of the underlying lawsuits, Siebe also informed Gerson that plaintiffs in the underlying lawsuits testified at their depositions that their use of the masks contributed to their injuries.

120 (1991). Our review is de novo. See *Kennie* v. *Natural Resource Dept. of Dennis*, 69 Mass. App. Ct. 158, 161 (2007). See also *Buchanan* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. 244, 247 n.5 (2005) ("Because the interpretation of the terms of a contract or agreement is a pure question of law, we exercise de novo review over this issue").

1. *Interpretation of the contractual provisions.* The facts are not disputed; thus, we review the record to determine if either party is entitled to judgment as a matter of law. At issue is the application of paragraphs 8c.(1) and 8d.(1) of the PSA to the facts in light of the governing law. Pursuant to the choice of law clause in the PSA, we apply Rhode Island law to interpret the two provisions. We note that the relevant Rhode Island law does not differ in material respect from Massachusetts law.[9]

a. *The plain meaning of the terms of the contractual provisions.* It is a well-settled rule of contract interpretation that to determine "whether an agreement is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." *W.P. Assocs.* v. *Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994). Only when an agreement is "reasonably and clearly susceptible" to more than one interpretation is it deemed to be ambiguous.[10] *Ibid.* See *Rotelli* v. *Catanzaro*, 686 A.2d 91, 94 (R.I. 1996). "If the terms are found to be unambiguous, however, the task of judicial construction is at an end and the parties are bound by the plain and ordinary meaning of the terms of the contract." *Zarrella* v. *Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249, 1259 (R.I. 2003). See *Capital Properties, Inc.* v. *State*, 749 A.2d 1069, 1081 (R.I. 1999); *Rivera* v. *Gagnon*, 847 A.2d 280, 284 (R.I. 2004).

In interpreting contractual terms, courts look at the intent of the parties. *Capital Properties, Inc., supra.* When the intentions of the parties can be clearly inferred from the terms of the contract, the court will enforce those intentions as long as they

---

[9]See notes 11 and 20, *infra.*

[10]Where a contract is construed on its terms, the court must interpret it as a matter of law; where a contract is deemed ambiguous, construction of the terms becomes a question of fact. *Judd Realty, Inc.* v. *Tedesco*, 400 A.2d 952, 955 (R.I. 1979). See *Westinghouse Bdcst. Co.* v. *Dial Media, Inc.*, 410 A.2d 986, 990 (R.I. 1980) ("summary judgment may not be proper when the case involves an ambiguous contract").

"can be fairly carried out consistent with settled rules of law." *Ibid.*, quoting from *Hill* v. *M.S. Alper & Son, Inc.*, 256 A.2d 10, 15 (R.I. 1969).

Notably, when a contract is clear and unambiguous, the parol evidence rule bars admission of extrinsic evidence "that would purport to contradict or modify the express terms of the written contract." *Samos* v. *43 East Realty Corp.*, 811 A.2d 642, 643 (R.I. 2002), quoting from *Egidio DiPardo & Sons, Inc.* v. *Lauzon*, 708 A.2d 165, 176 (R.I. 1998). See *Supreme Woodworking Co.* v. *Zuckerberg*, 107 A.2d 287, 290 (R.I. 1954).[11]

After a review of the PSA's paragraphs 8c.(1) and 8d.(1), we conclude that the language used is clear and unambiguous[12]; it reflects the intentions of the parties, and is susceptible only to one interpretation. See *Rotelli, supra* at 94; *Capital Properties, Inc., supra* at 1081. Therefore, in construing provisions, we give the language its plain and ordinary meaning, without reference to any extrinsic evidence.[13] See *Supreme Woodworking Co., supra*; *Capital Properties, Inc., supra*; *Samos, supra*.

---

[11]The same standard is applied by the Massachusetts courts. "[W]hen the words of a contract are plain and free from ambiguity they must be construed in their usual and ordinary sense." *Larabee* v. *Potvin Lumber Co.*, 390 Mass. 636, 641 (1983). The rule of parol evidence does not permit the admission of any extrinsic evidence to vary the terms of an unambiguous contract. See *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 754 (1973); *Ward* v. *Grant*, 9 Mass. App. Ct. 364, 368 (1980). However, the parol evidence rule "does not bar extrinsic evidence that elucidates the meaning of an ambiguous contract." *Winchester Gables, Inc.* v. *Host Marriott Corp.*, 70 Mass. App. Ct. 585, 591 (2007), quoting from *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 496 (1997).

[12]The rule of contra proferentem (i.e., agreements are to be construed against the drafting party) may be invoked to aid in the interpretation of ambiguous agreements and, therefore, is not applicable in the instant case. See *Rhode Island Hosp. Trust Natl. Bank* v. *McKee Bros. Oil Corp.*, 649 A.2d 511, 511 (R.I. 1994).

[13]Some case law implies that even if there is no ambiguity in contractual language, the court may still consider the situation of the parties and the accompanying circumstances at the time the contract was entered into, not for the purpose of modifying the terms, but to assist in determining the meaning of the contract. See *Hill, supra*. In determining the meaning of a contractual provision, the court will prefer an interpretation "which gives a reasonable, lawful and effective meaning to all manifestations of intention, rather than one which leaves a part of those manifestations unreasonable, unlawful or no effect." *Ibid.* However, following the general rule of parol evidence, we do not need to consider extrinsic evidence of the parties' intent, where, as here,

As noted, the PSA's paragraph 8d.(1) specifies that Gerson has a duty to "defend, indemnify and hold harmless [Siebe] . . . from and against all claims . . . arising out of any breach of the warranties specified in Paragraph 8c.(i)." Siebe contends that the judge disregarded the plain meaning of the terms "claim" and "defend" — in effect read them out of the PSA — when he ruled that an actual breach of NIOSH regulations or an actual breach of warranty had to be established to trigger Gerson's duty to defend. In these cases, we first look to the dictionary meaning of the language at issue to determine its plain and ordinary meaning. See *Westinghouse Bdcst. Co.* v. *Dial Media, Inc.*, 410 A.2d 986, 992 n.11 (R.I. 1980).

The term "claim" is defined as "the assertion of an existing right"[14]; and "assertion," in turn, is defined as an "allegation." Black's Law Dictionary 264, 124 (8th ed. 2004). The term "defend" is defined as (1) "[t]o deny, contest, or oppose (an allegation or claim)" and (2) "[t]o represent (someone) as an attorney."[15] *Id.* at 450. Applying the plain definitions of these terms, it is evident that Gerson agreed to defend Siebe in connection with any allegations arising out of Gerson's breach of the warranties specified in 8c.(1). The fact that Gerson also agreed to indemnify Siebe does not negate the fact that Gerson agreed to defend Siebe against any claims arising out of any breach of the warranties specified.[16]

the contractual provisions at issue are clear and unambiguous and the parties' intent can be inferred from the contractual terms. See *Supreme Woodworking Co.*, *supra*; *Egidio DiPardo & Sons, Inc.*, *supra*; *Samos, supra*. See also *W.P. Assocs.*, *supra*; *Capital Properties, Inc.*, *supra* at 1081. Accordingly, we will not consider the affidavits of attorneys James Spool, Roy Atwood, and Karen Maston, which Siebe offered to show the parties' intentions.

[14]Merriam Webster's Dictionary defines the word "claim" as "an assertion open to challenge." Merriam Webster's Collegiate Dictionary 227 (11th ed. 2005).

[15]Merriam Webster's Dictionary defines the word "defend" as "to act as attorney for . . . to deny or oppose the right of a plaintiff in regard to (a suit or a wrong charged)." Merriam Webster's Collegiate Dictionary, *supra* at 326.

[16]Gerson agreed to both defend *and* indemnify Siebe. See PSA, paragraph 8c.(1). Generally, the conjunctive "and" should not be considered as the equivalent of the disjunctive "or." *Earle* v. *Zoning Bd. of Review*, 191 A.2d 161, 163 (R.I. 1963). "Statutory phrases separated by the word 'and' are usually to be interpreted in the conjunctive." 1A Singer, Sutherland Statutory Construction § 21.14 (6th ed. 2002).

We find unavailing Gerson's contention that because the term "alleged" is missing from 8d.(1), the *actual* breach of NIOSH standards must be established to trigger Siebe's duties under this provision. Although omission of the term "alleged" might in some circumstances create such an inference, the present case does not warrant such a conclusion. See *W.P. Assocs.*, supra at 356-357 (holding that specific omission of an explicit reference to a claim in a release did not render the contract ambiguous; thus, the contract clearly discharged outstanding balance of promissory note). Paragraph 8d.(1) covers all "claims" which, as discussed above, are synonymous with "allegations"; therefore, omission of the term "alleged" is immaterial and does not vitiate Gerson's duty to defend Siebe against claims covered under 8c.(1).

In sum, given the ordinary meaning of the words in the contractual provisions at issue, we conclude that the provisions impose on Gerson a duty to defend Siebe in connection with any alleged breaches covered under 8c.(1).

b. *The claims in the underlying lawsuits and the coverage of the contractual provisions.* Following our determination that the PSA clearly and unambiguously identifies Gerson's duty to defend Siebe, our next inquiry is whether the claims in the underlying lawsuits fall within the coverage of the PSA's paragraphs 8c.(1) and 8d.(1). We conclude that paragraph 8d.(1) is analogous to an insurance agreement, where an insurer obligates itself to defend the insured against claims covered by the insurance policy.[17] While we are not aware of any reported Rhode Island decisions addressing the applicability of the duty to defend standard to commercial contracts, we find suggestive (although not dispositive) *Urban Inv. & Dev. Co.* v. *Turner Constr. Co.*, 35 Mass. App. Ct. 100 (1993). That case involved an indemnity and defense provision in a commercial contract between a general contractor

---

[17]Gerson argues, relying primarily on *Ervin* v. *Sears, Roebuck & Co.*, 127 Ill. App. 3d 982 (1984), that the usual duty to defend standard, applicable to insurance contracts, does not apply to indemnification provisions ancillary to ordinary commercial agreements. *Ervin* does not appear to have been followed anywhere outside Illinois (where it seems to have been limited, see, e.g., *Applied Industrial Materials Corp.* v. *Mallinckrodt, Inc.*, 102 F. Supp. 2d 934, 942-944 [N.D. Ill. 2000]), and we do not find its reasoning persuasive in this case.

and a subcontractor.[18] In determining that the claims (even though ultimately unsuccessful) fell within the coverage of the contractual provision obligating the indemnification of costs incurred defending them, this court was informed by the standard utilized in insurance cases. See *id.* at 107-108.

Massachusetts authority provides guidance in determining whether an insurer has a duty to defend the insured, because Massachusetts, like Rhode Island, applies the "pleadings test." *Progressive Cas. Ins. Co.* v. *Narragansett Auto Sales,* 764 A.2d 722, 724 (R.I. 2001). See *Sterilite Corp.* v. *Continental Cas. Co.,* 17 Mass. App. Ct. 316, 318 (1983). Under the pleadings test, the duty to defend — which is broader than the duty to indemnify[19] — is determined by laying the underlying complaint "alongside the [insurance] policy; if the allegations in the complaint fall within the risk insured against in the policy, the insurer is said to be duty-bound to provide a defense for the insured." *Emhart Indus., Inc.* v. *Home Ins. Co.,* 515 F. Supp. 2d 228, 236 (D.R.I. 2007), quoting from *Employers' Fire Ins. Co.* v. *Beals,* 240 A.2d 397, 402 (R.I. 1968). See *Aetna Cas. & Sur. Co.* v. *Kelly,* 889 F. Supp. 535, 541 (D.R.I. 1995); *Employers Mut. Cas. Co.* v. *PIC Contractors, Inc.,* 24 F. Supp. 2d 212, 215-216 (D.R.I. 1998).[20] "[I]n other words, when a complaint contains a statement of facts which bring the case within or potentially within the risk coverage of the policy, the insurer has an unequivocal duty to defend"

---

[18]The contract required the subcontractor to carry liability insurance to fulfill its indemnification obligation to the contractor.

[19]See *Aetna Cas. & Sur. Co.* v. *Kelly,* 889 F. Supp. 535, 540 (D.R.I. 1995); *Employers Mut. Cas. Co.* v. *PIC Contractors, Inc.,* 24 F. Supp. 2d 212, 215 (D.R.I. 1998); *Mellow* v. *Medical Malpractice Joint Underwriting Assn. of R.I.,* 567 A.2d 367, 368 (R.I. 1989).

[20]Similarly, "[i]t is settled in [Massachusetts] that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." *Sterilite Corp., supra.* See *Swift* v. *Fitchburg Mut. Ins. Co.,* 45 Mass. App. Ct. 617, 623 (1998). "However, when the allegations in the underlying complaint 'lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate' or defend the claimant." *Timpson* v. *Transamerica Ins. Co.,* 41 Mass. App. Ct. 344, 347 (1996), quoting from *Terrio* v. *McDonough,* 16 Mass. App. Ct. 163, 168 (1983).

(emphasis omitted). *Emhart Indus., Inc., supra,* quoting from *Employers' Fire Ins. Co., supra* at 403. See *Flori* v. *Allstate Ins. Co.,* 388 A.2d 25, 26 (R.I. 1978); *Hingham Mut. Fire Ins. Co.* v. *Heroux,* 549 A.2d 265, 266 (R.I. 1988); *Allstate Ins. Co.* v. *Russo,* 641 A.2d 1304, 1306 (R.I. 1994).

The obligation to defend exists even though the claim against the insured appears to lack merit, and even though there may be additional facts tending to negate coverage.[21] *Flori, supra.* However, "a reasonableness requirement is implicit in the pleadings test" in order to defeat attempts to " 'plead to coverage' by characterizing a claim as something other than what is described in the complaint's factual allegations." *Narragansett Jewelry Co.* v. *St. Paul Fire & Marine Ins. Co.,* 526 F. Supp. 2d 245, 248-249 (D.R.I. 2007). See *Peerless Ins. Co.* v. *Viegas,* 667 A.2d 785, 789 (R.I. 1995) ("A plaintiff, by describing his or her cat to be a dog, cannot simply by that descriptive designation cause the cat to bark"). Furthermore, "[a]ny doubts as to whether the complaint alleges an event covered under the policy must be resolved in favor of the insured." *Narragansett Jewelry Co., supra* at 248. See *Allstate Ins. Co., supra.*

Finally, insurance policies are interpreted "according to the same rules of construction governing contracts." *Cumberland* v. *Rhode Island Interlocal Risk Mmgt. Trust, Inc.,* 860 A.2d 1210, 1215 (R.I. 2004). The courts view the policy in its entirety, affording the terms their ordinary, plain, and usual meaning. *Ibid.* See *Malo* v. *Aetna Cas. & Sur. Co.,* 459 A.2d 954, 956 (R.I. 1983). If a policy's terms are ambiguous, they must be "strictly construed in favor of the insured." *Cumberland, supra.* If a

---

[21]In *Flori, supra,* the court noted the broad scope of the duty to defend, stating:

> "[A]n insurer's duty to defend hinges not on whether the insured may ultimately be liable, but on whether the complaint in the underlying tort action alleges facts and circumstances bringing the case within the coverage afforded by the policy. That question is resolved by comparing the complaint in that action with the policy issued by the insurer; if the complaint discloses a statement of facts bringing the case potentially within the risk coverage of the policy the insurer will be duty-bound to defend irrespective of whether the plaintiffs in the tort action can or will ultimately prevail. [Citations omitted.] This test determines an insurer's duty to defend even if the known facts conflict with the facts alleged in the third-party complaint."

policy's terms are unambiguous, they will be construed and applied as written. *Malo, supra.*

As we articulated above, the terms of the PSA provisions at issue are clear and unambiguous; thus, we construe and apply them as written in deciding whether they cover the claims in the underlying lawsuits. See *ibid.*; *Cumberland, supra.*

Guided by the broad pleadings test, we compare the claims in the underlying lawsuits to the relevant PSA provisions, which indicate that Gerson will defend claims that arise out of noncompliance with NIOSH requirements and defects in materials and workmanship as defined by Gerson's quality plan. It is true that in none of the underlying lawsuits did the plaintiffs specifically allege that the Gerson masks failed to comply with the NIOSH approvals, violated any specified NIOSH regulation, or otherwise were defective in materials or workmanship in the narrow sense described in the PSA (i.e., as defined by Gerson's quality specifications detailed in its quality plan, per paragraph 8c.[1][ii]). However, as Siebe points out, the plaintiffs did allege that the masks were insufficiently tested before being sold. NIOSH approval is contingent upon ongoing inspections, testing, and quality control procedures as set forth in what is known as a "quality plan." See 42 C.F.R. §§ 84.42(c), 84.43(c). Thus, while the allegations are not very particular, they nonetheless target noncompliance with NIOSH regulations and with Gerson's quality plan, both of which require extensive testing and inspection of the masks.[22]

Furthermore, the plaintiffs in all three underlying lawsuits alleged general defects in materials or workmanship of the masks. While 8c.(1)(ii), providing for warranty against defects, is limited to the specifications in Gerson's quality plan, in light of Rhode Island's broad pleadings test, the plaintiffs' general allegations of defect may reasonably be interpreted as bringing the cases potentially within the coverage of the provisions at issue. See *Hingham Mut. Fire Ins. Co.* v. *Heroux*, 549 A.2d at 266; *Allstate Ins. Co.* v. *Russo*, 641 A.2d at 1306.

Moreover, under the pleadings test, Siebe is not required to

---

[22]Various experts offered testimony to the effect that the masks violated NIOSH regulations because they could "not be fit tested" and because of "the lack of a proper quality control program."

establish that the underlying claims have merit; Siebe must only demonstrate that the claims fall within the PSA's coverage, which it did. See *Flori* v. *Allstate Ins. Co.*, 388 A.2d at 25-26. Indeed, the broad approach to the duty to defend is intended for circumstances such as these, where a narrow reading of the PSA's provisions might preclude coverage, but the alleged underlying causes of action are sufficiently broad to fall within the coverage. Thus, while we agree with Gerson that the allegations in the underlying lawsuits are short on specifics, we nonetheless conclude that they fall within the relevant provisions of the PSA, therefore triggering Gerson's duty to defend.

We note that while we apply insurance principles here, we do not suggest as a general matter that the same standards apply to indemnity and duty to defend provisions in the commercial and insurance contexts. Compare *Johnson* v. *Modern Continental Constr. Co.*, 49 Mass. App. Ct. 545, 548 (2000) (coverage questions under an insurance contract not analogous to coverage under an indemnity provision of a construction contract). The particular circumstances of the commercial transaction at issue must be evaluated to determine whether the pleadings test will apply. For example, there may be factors underlying the development of insurance law that are not present in an arm's-length negotiated contract between two commercial actors, which would make the application of insurance principles inappropriate in a commercial setting. Here, however, those factors are not present.

2. *Statute of limitations.* Gerson argues that Siebe's claims must be rejected on limitations grounds, contending that they are time-barred under the Uniform Commercial Code (UCC) statute applicable to contract-based breach of warranty claims.[23] See G. L. c. 106, § 2-725. The statute, which applies to breaches of contracts for the sale of goods, provides in relevant part:

"A cause of action accrues when the breach occurs, regard-

---

[23]The judge did not address this argument. In this case, under the significant relationship test, Massachusetts applies its own statute of limitations. See *New England Tel. & Tel. Co.* v. *Gourdeau Constr. Co.*, 419 Mass. 658, 660-661 (1995) (applying forum state's statute of limitations based on significant relationship test). As a practical matter, the question whether the Massachusetts or Rhode Island statute of limitations applies is of no consequence here. See note 25, *infra.*

less of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

G. L. c. 106, § 2-725(2), inserted by St. 1957, c. 765, § 1.

It is well established that G. L. c. 106, § 2-725(2), applies to contract-based warranty breaches governed by the UCC. See *Bay State-Spray & Provincetown S.S., Inc.* v. *Caterpillar Tractor Co.*, 404 Mass. 103, 110 (1989) ("The appropriate statute of limitations to apply to a breach of warranty claim under art. 2 of the Uniform Commercial Code is found by determining the nature of that particular breach of warranty claim. If . . . the claim asserts a contract-based theory of liability, § 2-725 . . . furnishes the applicable statute of limitations"). See also *New England Power Co.* v. *Riley Stoker Corp.*, 20 Mass. App. Ct. 25, 27 (1985); *Rosario* v. *Knowlton Co.*, 54 Mass. App. Ct. 796, 803 (2002).

In determining which statute of limitations to apply to a given claim, we "must look to the 'gist of the action,' " *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engineers, Inc.*, 396 Mass. 818, 823 (1986), quoting from *Hendrickson* v. *Sears*, 365 Mass. 83, 85 (1974), and should avoid "an illogical result." *Bay State-Spray & Provincetown S.S., Inc.*, supra at 110-111. In our view, G. L. c. 106, § 2-725(2), relating to the breach of warranty claims, does not apply here. Siebe does not allege that Gerson breached any warranties in relation to the masks; rather Siebe asserts that Gerson breached its duty to defend Siebe in connection with the underlying lawsuits.[24] Accordingly, G. L. c. 260,

---

[24]Arguably, the PSA can be treated as a "mixed" contract, analogous to a contract providing for both sale of goods and rendition of services. In such cases, to determine whether the UCC applies, the test is whether the predominant purpose of the contract is a provision of services, with goods incidentally involved, or is a transaction of sale, with labor incidentally involved. See *Cumberland Farms, Inc.* v. *Drehmann Paving & Flooring Co.*, 25 Mass. App. Ct. 530, 534 (1988). If the predominant purpose of such contract is rendition of services, then the UCC does not apply. *Ibid.* In the instant case, the defense and indemnity clauses are properly viewed as separate and distinct, the breach of which has nothing to do with a breach of the remainder of the PSA as relating to the sale and distribution of the masks. The defense and indemnity

§ 2, providing for a six-year limitations period, applies.[25] See G. L. c. 260, § 2. See also *John Beaudette, Inc.* v. *Sentry Ins. A Mut. Co.*, 94 F. Supp. 2d 77, 99 (D. Mass. 1999) (under Massachusetts law, action against liability insurer concerning duty to defend and indemnify insured is governed by statute of limitations applicable to contract actions).

The limitations period for an insured's cause of action against an insurer alleging breach of duty to defend begins to run when the insured is sued for negligence, the insurer refuses to defend, and the insured begins to incur defense costs. See *John Beaudette, Inc.*, supra at 100-105. See also *Epstein* v. *C.R. Bard, Inc.*, 460 F.3d 183, 187 (1st Cir. 2006); *Bowen* v. *Eli Lilly & Co., Inc.*, 408 Mass. 204, 205-206 (1990); *Felton* v. *Labor Relations Commn.*, 33 Mass. App. Ct. 926, 927-928 (1992).

Here, Gerson breached its contractual duty to defend in mid-2002, when notified by Siebe of the underlying lawsuits. The present action was filed in September of 2005, well within any potentially applicable limitations period. As such, Siebe's claims were timely, and its action is not barred by the applicable statute of limitations.

*Conclusion.* We reverse the judgment in favor of Gerson and remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

provisions here are a separate obligation, and as it concerns Gerson's duty to defend, rather than Gerson's duty to supply goods, G. L. c. 260, § 2, applies.

[25] Siebe does not concede that the Massachusetts statute of limitations applies to this case. However, even if we were to apply the Rhode Island equivalent of G. L. c. 260, § 2, the result would be the same, as the pertinent Rhode Island statute — R.I. Gen. Laws § 9-1-13(a) — provides for a ten-year limitations period.