NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-720

ALAN FILZER & others[1]

vs.

PITSICK LLC & others.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiffs are abutters or neighbors (abutters) of three separate nonconforming lots in the city of Newton that were being developed by Pitsick, LLC (Pitsick).  The abutters filed a Superior Court complaint alleging breach of contract by Pitsick of an agreement to resolve a Land Court action involving the lots.  They later added a claim that Pitsick's conduct, as well as that of its principal Stephen T. Pitrowski, amounted to a violation of G. L. c. 93A.  The parties' dispute arose because

_____

[1] Monica Crowley and Paul Crowley, Diane Dion and Arthur Dion, Judith Mannix and John Koot, Gerald Burg, and Patience Orobello and Joshua Shriber.  Gerald Burg, Patience Orobello, and Joshua Shriber did not participate in the appeal.

[2] Stephen T. Pitrowski and MountainOne Bank.  MountainOne Bank did not participate in the appeal.

they had not disclosed the agreement to the Land Court judge, who subsequently issued a decision on pending summary judgment motions in the Land Court action. The parties disagreed about how that Land Court judge's decision affected the agreement, if at all. In the Superior Court action relating to the agreement, the parties cross-moved for summary judgment, and a judge allowed the abutters' motion for summary judgment in part, determining that Pitsick had committed a breach of the agreement and its duty of good faith and fair dealing. After a bench trial on the G. L. c. 93A claim, the same judge found that Pitsick and Pitrowski (defendants) had engaged in unfair or deceptive conduct. Pitsick and Pitrowski appeal, arguing in essence that performance under the agreement was rendered impossible, or at least was frustrated, by the intervening Land Court judgment. We affirm.

Background. 1. Summary judgment record. "We summarize the undisputed facts drawn from the summary judgment record; to the extent the record includes disputed evidence, we consider that evidence in the light most favorable to . . ." the nonmoving party. Cesso v. Todd, 92 Mass. App. Ct. 131, 132 (2017). We reserve discussion of other facts as they become pertinent to our analysis.

2

The plaintiffs are abutters or neighbors of a development on three separate nonconforming lots -- lots 109, 110, and 111[3] -- on Goddard Street in Newton. Each lot contains 5,000 square feet and fifty feet of frontage. Lot 110 is situated between lots 109 and 111, and it has been improved with a single-family dwelling since around 1924.

In January 2011, the lots were conveyed to Pitrowski and his business partner, the principals of Pitsick, a Massachusetts limited liability company that develops and sells residential real estate. Soon after, Pitsick obtained building permits to construct single-family homes on lots 109 and 111.

In January 2012, Pitsick began construction and excavation on lots 109 and 111. At that time, the abutters requested that the building commissioner revoke Pitsick's building permits for lots 109 and 111.[4] When the commissioner did not respond to their request, the abutters then filed a complaint in the Land Court for, and later obtained, an order of mandamus directing the building commissioner to act relative to the two building

_____

[3] Known respectively as 26, 22, and 18 Goddard Street.

[4] In May 2012, Pitsick conveyed lot 110 to another LLC, who then conveyed the lot to Patience Orobello and Joshua Shriber, who later signed the agreement at issue and joined the Superior Court case as plaintiffs. They were eventually voluntarily dismissed as plaintiffs. As noted earlier, Orobello and Shriber did not participate in this appeal. They also did not participate in the Land Court case.

3

permits issued for lots 109 and 111.  The building commissioner promptly denied the request to revoke the permits.

In January 2013, the abutters appealed the building commissioner's denial to the Zoning Board of Appeals (ZBA), which reversed the building commissioner's denial and revoked the building permits for lots 109 and 111.  Pitsick appealed the revocation of the permits for lots 109 and 111 to the Land Court, naming as defendants the abutters and members of the ZBA. The parties argued cross motions for summary judgment.

While the summary judgment motions were pending, and without notifying the Land Court judge, the abutters, the owners of lot 110, Pitsick, Pitsick's principals, and Pitsick's construction lender, MountainOne Bank, entered into an agreement on April 6, 2015.[5]  Through the agreement, the abutters and the defendants "agreed to compromise their differences without further litigation."  The agreement generally provided that Pitsick would:  (1) pay $80,000 to the abutters; (2) apply, with the abutters' support,[6] for a special permit from the ZBA to redivide the three lots into two lots (comprising 7,000 and

---

[5] The ZBA, while a party to the Land Court case, was not a party to the agreement, and MountainOne Bank, while not a party to the Land Court case, was a party to the agreement.

[6] The abutters and their counsel testified in favor of the issuance of the special permit in person at the public hearing.

4

8,000 square feet), thereby enabling Pitsick to complete the single-family home partially constructed on lot 109 consistent with the original building permit for that lot; (3) restore lot 111 to substantially its landscaped condition prior to Pitsick's excavation and construction work; (4) remove a driveway and install a new driveway on lot 110 and restrict any construction of a new single-car garage on lot 110 to certain limits; and (5) declare and record a declaration of restrictive covenants to run with the land for thirty years limiting the construction of any structure on lot 111.  It provided that, once those enumerated conditions were met, Pitsick and the abutters would, "together with" the ZBA, promptly execute and file a stipulation of dismissal of their case in the Land Court.

As part of the agreement, the parties jointly contracted not to notify the Land Court judge of the agreement though they knew the Land Court judge could rule on the summary judgment motions at any time.  In fact, the agreement stated that "[a]ny notification" of the agreement to the Land Court prior to the issuance of the special permit and expiration of all applicable appeal periods would constitute a "violation" of the agreement.

The agreement also provided a contingency in the event that the Land Court judge decided the then-pending summary judgment motions, expressly stating, "This Agreement shall be binding

5

upon the Parties in resolution of all matters at issue in the Litigation, and <u>shall supersede in force and effect any judgment or order issued by the Land Court on the Parties' pending motion and cross-motions for summary judgment in the Litigation</u> . . ." (emphasis added).

The special permit to resubdivide the three lots into two lots was approved on April 6, 2015.[7]  According to the agreement, the special permit was subject to an appeals period of sixty days.  On May 14, 2015, the Land Court judge entered a decision and judgment, finding lots 110 and 111 had merged into a single lot because of common ownership in 1940, and lot 109 to be a standalone buildable lot with preexisting nonconforming use

---

[7] Under section 3.2(d) of the agreement, the parties agreed that Pitsick could be released from its obligations if, "within ten (10) calendar days of issuance of the Special Permit," it determined and notified the other parties in writing that "unreasonable conditions" had been imposed on the special permit.  "Unreasonable conditions," per the agreement, included:

"any conditions imposed by the Board of Aldermen or any other municipal entity to the issuance of, or contained in, the Special Permit that would increase the cost to the [defendants] of complying with the terms of this Agreement by more than $10,000.00, but excluding ordinary conditions such as preparation of site plans, as-built plans and the like, or the preparation of a modified easement plan, and the [defendants'] attorney's fees."

Pitsick did not notify any other party within the prescribed period of any "unreasonable conditions" imposed by or contained in the special permit.

protection under G. L. c. 40A, § 6.[8]  The judge also stressed the

principles of equity in concluding that lot 109 was buildable,

though it did not meet the necessary 10,000 square foot minimum.

At the time of the Land Court decision, the structure on lot 109

was "ninety-five per cent complete" and the defendants had

relied on the building commissioner's interpretation of the law

that was later rejected in Mauri v. Zoning Bd. of Appeals of

Newton, 83 Mass. App. Ct. 336, 342 (2013).[9]  Ultimately, the

judge ordered the building permit on lot 109 to be reinstated.

---

[8] The decision extensively recounted the history of
ownership of the three lots.  Lot 109, prior to the defendants'
acquisition of it, had been a thickly wooded lot with no
improvements, and historically it had been treated as a
standalone lot for tax purposes even when periodically owned by
the same owners as lots 110 and 111.  Lots 110 and 111, on the
other hand, were taxed jointly until 2012, around the time that
the defendants conveyed lot 110 to an LLC, who then conveyed it
to its current owners.  Historically, the previous owners had
used lots 110 and 111 as common property; for example, from
approximately 1928 to 2011, a freestanding garage servicing the
house on lot 110 existed across the lot line between lots 110
and 111.  In 1940, while lots 110 and 111 were held in common
ownership, an applicable zoning ordinance imposed a new lot size
requirement of 7,000 square feet minimum; in 1953, a new zoning
ordinance further increased the lot size requirement to a
minimum of 10,000 square feet (which is the current minimum lot
size and the total size of the merged lots 110 and 111).
Accordingly, lots 110 and 111 were "rendered . . . adjacent,
non-conforming, commonly-held lots" in 1940 and "necessarily
merged for zoning purposes."  The current owners of lot 110 were
not parties to the Land Court case, and the decision did not
discuss how the merger for zoning purposes would affect the
ownership of lots 110 and 111.

[9] The Supreme Judicial Court denied further appellate
review.  See 465 Mass. 1104 (2013).

Even though the structure on lot 111 constituted a violation of the zoning ordinance, the judge declined to issue an order directing the structure on lot 111 be razed.  The judge noted it might be possible for the defendants to apply for a variance to build on lot 111; but, without such a variance, the ZBA was right to revoke the building permit for lot 111.  The judge acknowledged that the "path forward for the parties is now somewhat uncertain."

After the Land Court decision, Pitrowski and Pitsick expressed concerns as to the decision's legal effect on the agreement.  The defendants' counsel wrote to the city's counsel seeking a guarantee that the special permit was not supplanted by the Land Court decision and remained valid, but the defendants received no written assurance.  Meanwhile, the abutters' counsel asked Pitsick to consent to an extension of time to file a motion for reconsideration of the Land Court decision.  Pitsick did not agree.  Facing a deadline to seek reconsideration, the abutters' counsel wrote to Pitsick's counsel, expressing that "conversations" between counsel had "created doubts" about whether Pitsick intended to perform its obligations under the agreement and asked for "written assurance" that Pitsick would "abide by and promptly perform in full its obligations" set out in the agreement.

8

Pitsick responded by proposing to renegotiate the agreement, sending a proposal that the parties agree "that the current Settlement Agreement is null and void," and by separately declaring that the agreement was null and void. The abutters rejected this proposal and reaffirmed their belief that the agreement and special permit remained valid. Over the next month, both the defendants' and abutters' counsel continued conversations but, ultimately, the defendants failed to confirm that they would abide by the agreement.

On June 5, 2015, the abutters filed a motion for reconsideration of the Land Court decision.[10] On June 8, 2015, Pitsick took the position that it was allowed to void the agreement because the abutters' Land Court filings would cause it to expend more than $10,000, which it claimed constituted an "unreasonable condition" under the agreement.

The abutters then initiated the present Superior Court action on July 28, 2015, essentially seeking specific performance of the defendants' obligations under the agreement and damages for breach of contract and breach of the implied covenant of good faith and fair dealing.[11]

---

[10] All parties appealed the decision of the Land Court. The parties dismissed their appeals by agreement in January 2016.

[11] The abutters also initially brought a breach of contract claim against MountainOne Bank, Pitsick's lender, for its

9

2.  _Trial record_.  After a bench trial, the judge adopted the stipulation of undisputed facts and legal conclusions from the summary judgment record and his earlier memorandum and order on the cross motions for summary judgment.  Given the "tremendous amount of overlap between the plaintiffs' proposed findings and [the judge's] summary judgment ruling," the judge clarified that he also adopted much of the plaintiffs' proposed findings of fact as well as portions of the defendants' admitted facts.  Additionally, the judge found the following.

The defendants' failure to give assurances that they would honor the agreement was justification for the "placeholder filings" by the plaintiff in the Land Court case.

The judge also found that Pitrowski "felt that, as a result of the [Land Court decision], Pitsick was not getting the full benefit it hoped under the settlement agreement."  As a result, "Pitsick tried to gain a benefit and gain a better deal in light of [the Land Court] decision and the uncertainty that it created," which constituted an unfair trade practice.  Because the judge found that Pitrowski believed he was justified in his position, the judge did not find the defendants' use of the

---

failure to disburse the payment; but, in May 2016, the abutters agreed that the dispute was properly between the defendants and the abutters, and MountainOne Bank in turn would abide by the litigation's outcome regarding the enforceability of the agreement.

10

unfair practice to be a knowing or willful violation of G. L. c. 93A, § 2, and therefore did not multiply damages. Accordingly, the judge determined that the damages included the $80,000 owed under the agreement as well as $15,000 in nominal damages, including interest from the date of filing at the statutory rate plus reasonable attorney's fees.[12]

Discussion. 1. Summary judgment. Summary judgment may enter when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). "We review a grant of summary

_____

[12] The judge initially ordered, on April 22, 2024, that the plaintiffs were "entitled to specific performance of promises made in the Settlement Agreement to the extent they are not mooted or rendered impracticable by subsequent events," presumably meaning the dismissal of the owners of lot 110 from the case and the abutters' stipulation of waiver in relation. On May 1, 2024, the judge amended the order for entry of final judgment regarding the specific performance under the agreement requiring improvements and recorded restrictions to run with the land, specifically as to certain restrictive covenants on lots 109 and 111. The declaration of restrictive covenants applied to Pitsick, as the owner of lots 109 and 111, and generally prohibited any construction or improvement on lot 111 (except for minor portions of a single-car garage and driveway located primarily on lot 110 and fencing) as well as any increase in size to the dwelling structure on lot 109. In this May 1, 2024, order, the Superior Court judge noted that the lot reconfiguration envisioned in the agreement was not at issue and therefore his order did "not reference[] the plan" as it had "no continued relevance." Indeed, the abutters had expressed repeatedly that they did not intend to pursue the reconfiguration of the lots in connection with the dismissal of the owners of lot 110.

11

judgment de novo," Deutsche Bank Nat'l Trust Co. v. Fitchburg Capital, LLC, 471 Mass. 248, 252-253 (2015), to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law" (citation omitted), Molina v. State Garden, Inc., 88 Mass. App. Ct. 173, 177 (2015).

    a. Impossibility and frustration of purpose. The defendants argue that the summary judgment in favor of the abutters should be vacated because the Land Court decision rendered performance of the agreement "impossible, or at the very least impractical."[13] We disagree.

"Performance under a contract may be excused in limited situations where unanticipated supervening events require it." Le Fort Enters., Inc. v. Lantern 18, LLC, 491 Mass. 144, 150 (2023). The doctrine of impossibility releases a party from obligations under a contract where performance has become impracticable, and that impracticability was "caused by the

_____

[13] The defendants argue that they were "entitled to present [their] claims of impracticability, impossibility and frustration of purpose to a jury." "However, where the material facts are not in dispute and 'no rational view of the evidence' permits a finding of impracticability or frustration of purpose, summary judgment is proper." Le Fort Enters., Inc. v. Lantern 18, LLC, 491 Mass. 144, 149 (2023), quoting Petrell v. Shaw, 453 Mass. 377, 381 (2009).

occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made" (quotation and citation omitted).  Mishara Constr. Co. v. Transit-Mixed Concrete Corp., 365 Mass. 122, 127 (1974).  "[A] contracting party cannot be excused where the only 'frustration' consists in the fact that known risks assumed by him have turned out to his disadvantage" (citations omitted).  Baetjer v. New England Alcohol Co., 319 Mass. 592, 602 (1946).

The defendants contend that, as a result of the Land Court judgment, the redivision of the lots as envisioned under the agreement cannot be legally given effect because the merged lot 110 and 111, as created under the Land Court judgment, "exactly meets the lot area requirements" under the zoning ordinance. The reduction in size as to the merged lot, as contemplated by the agreement and corresponding 2015 special permit, therefore would create an improper nonconformity.  See, e.g., 81 Spooner Rd., LLC v. Zoning Bd. of Appeals of Brookline, 78 Mass. App. Ct. 233, 247 (2010), S.C., 461 Mass. 692 (2012) (new building lot could not be formed "by dividing an existing conforming lot if as a result the latter is rendered nonconforming by such a division").

Here, the agreement contained more than just the redivision of the lots.  In fact, the heart of the agreement appears to

13

have been to create a compromise between the parties to end the litigation, which notably could have resulted in a judgment affirming the revocation of both building permits for lots 109 and 111. As a result of the compromise, the abutters agreed to support the defendants in their application for a special permit to complete the construction project on lot 109. In exchange for the abutters' support, Pitsick agreed to pay $80,000 to the abutters, to record certain restrictive covenants pertaining to the construction of a single-car garage on lot 110, and perform certain landscaping obligations on lot 111 to return lot 111 to its natural state. Notably, there is nothing in the record showing -- and the defendants made no argument that -- the judgment prevented any construction on lot 109; and, in fact, by the time of trial, the defendants had finished construction on a single-family residence and were issued a certificate of use and occupancy by the city. No rational view of this record permits a finding of impracticability of the agreement. See Le Fort Enters., Inc., 491 Mass. at 149.

Nor was the defendants' purpose frustrated, as the defendants argue in the alternative. See Chase Precast Corp. v. John J. Paonessa Co., 409 Mass. 371, 375 (1991) (frustration of purpose exists where "party's principal purpose is substantially frustrated without his fault by the occurrence of an event the

14

non-occurrence of which was a basic assumption on which the contract was made" [citation omitted]).  The Land Court decision was not an "unanticipated circumstance" (citation omitted).  Chase Precast Corp., 409 Mass. at 374.  In fact, the agreement expressly considered the possibility of a Land Court judgment.[14]  The judge concluded, and we agree, that the agreement expressly accounted for such an outcome.  At the very least, as the judge noted, when the parties entered into the agreement, they "knew or should have known the Land Court might enter a decision on the then-pending motions."

b.  Bad faith.  The defendants next argue that summary judgment against them was inappropriate as they "should have been afforded the opportunity for a jury to determine whether [the defendants] had acted in bad faith or had a legitimate purpose for their actions."  We disagree.

While "[t]he granting of summary judgment in a case where a party's state of mind or motive constitutes an essential element of the cause of action is disfavored," Quincy Mut. Fire Ins. Co.

---

[14] The agreement stated that it would "supersede" any judgment from the Land Court.  We need not address whether parties can enter into a settlement agreement that is to supersede a decision of a judge of one of the trial courts.  We note only that the defendants' signing onto the agreement, which expressly considered the likelihood and potential effect of such a judgment, shows that the judgment could not constitute an unanticipated circumstance.

15

v. Abernathy, 393 Mass. 81, 86 (1984), the "essence of bad faith, in this context, is not the state of mind but rather the attendant bad actions," E.A. Miller, Inc. v. South Shore Bank, 405 Mass. 95, 100 (1989).

The communications between the parties consisted almost entirely of undisputed e-mails, supplemented by the affidavits of counsel.  As the summary judgment record shows, when the abutters sought confirmation that the defendants were still intending to abide by the agreement, the defendants not only refused to give that confirmation but instead attempted to "renegotiate a different deal that would have declared the Settlement Agreement null and void."  As the judge concluded, this amounted to an anticipatory repudiation of the agreement.  See K.G.M. Custom Homes, Inc. v. Prosky, 468 Mass. 247, 253-254 (2014).  As a result of the defendants' refusals to give assurances regarding their obligations under the agreement, the abutters -- predicting the defendants' breach of the agreement based on their anticipatory repudiation of the agreement -- filed a motion for additional time to file a motion for reconsideration, a motion for reconsideration, and ultimately a notice of appeal of the Land Court judgment as "placeholders, designed to preserve the [abutters'] rights in the event Pitsick refused to perform under the Settlement Agreement."

16

After the appeals period expired, the defendants indeed failed to comply with the agreement, claiming that the abutters' additional Land Court filings after the defendants' refusal to give assurances constituted an "unreasonable condition" under the agreement, allowing Pitsick to void the agreement. By the agreement's own express terms, however, a party was allowed to void the agreement based on an unreasonable condition only if such condition was being imposed on the special permit by a municipal authority and was disclosed to the abutters in writing within ten days of the issuance of the special permit. "It is a well-settled rule of contract interpretation that to determine 'whether an agreement is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning'" (citation omitted). Siebe, Inc. v. Louis M. Gerson Co., 74 Mass. App. Ct. 544, 549 (2009). The abutters' conduct therefore could not have reasonably been considered an unreasonable condition, as explicitly defined under the agreement, that would have excused Pitsick from its obligations.

2. Trial issues. On review of a bench trial, "[w]e accept the judge's findings of fact unless clearly erroneous, but we 'scrutinize without deference the legal standard which the judge applied to the facts.'" Ndoro v. Torres, 105 Mass. App. Ct.

17

128, 133 (2024), quoting Andover Hous. Auth. v. Shkolnik, 443 Mass. 300, 306 (2005).  On review of the claims advanced on appeal, we discern no errors by the trial judge.

a. Nonpayment by lender and interest award.  The defendants argue that, because the abutters and MountainOne Bank agreed to suspend any monetary payment set forth in the agreement until judgment in the underlying dispute, defendants Pitsick and Pitrowski should not have been held to have committed a breach of the agreement as "liability associated with the failure to release the funds should be borne by the Lender."  They further argue that it "would be inequitable to assess interest from the date of filing to the date of judgment" given the agreement entered into by the abutters and the lender where the abutters agreed not to pursue an order for payment.[15]  We disagree.

_____

[15] The defendants' counsel wisely conceded at oral argument that the Chief Justice of the Trial Court has the authority to make administrative assignments.  Additionally, the defendants concede their arguments pertaining to the admissibility of documents for intent purposes as moot.  Furthermore, defendants' counsel clarified that their argument that the complaint should not have been amended was "premised . . . exclusively" on the invalidity of the agreement with which, as discussed supra, we disagree.  The Superior Court judge did not abuse his discretion in allowing the abutters to amend their complaint.  See Mass. R. Civ. P. 15 (a), 365 Mass. 761 (1974).  The abutters' request for leave to amend the complaint was not futile where evidence existed to support their claims.

According to the agreement, the defendants were to "tender to the [abutters] through Lender the agreed aggregate sum of EIGHTY THOUSAND AND 00/100 DOLLARS ($80,000.00) . . . once the conditions thereto set forth below have been fully achieved." The express language of the agreement placed this obligation on the defendants, not the lender. See Siebe, Inc., 74 Mass. App. Ct. at 549 (plain meaning of terms of contractual provisions apply). In any event, the defendants then took actions to prevent the lender from disbursing the funds. Shortly after the dispute arose, the lender informed the parties that it "stands ready, willing, and able" to meet its obligations once the parties gave written authorization to disburse the funds. The defendants did not authorize the payment. And, in fact, when the abutters later sought an order from the trial court for MountainOne Bank to make the payment, the defendants opposed the motion.

The defendants next contend that interest should not have been ordered where the judge found that the abutters were entitled to specific performance of the agreement, which happened to include an $80,000 payment. However, the complaint sought both monetary damages and specific performance, and the judge referred to the monetary award -- the $80,000 as considered in the agreement and additional nominal damages of

19

$15,000 -- as damages. As such, the abutters were entitled to interest on their contract claim from at least the date they commenced the action, pursuant to G. L. c. 231, § 6C, which entitles them to interest from the date of the breach or the date the action was filed. Even in the alternative, however, interest would be appropriate if the money award had been an order of specific performance. See Brennan v. Ferreira, 102 Mass. App. Ct. 315, 318-319 (2023).

b. Chapter 93A. The defendants argue that the judge erred in finding the defendants violated G. L. c. 93A and awarding damages and attorney's fees for that claim.[16] However, the judge's factual finding that the defendants engaged in unfair or deceptive trade practices was not clearly erroneous. In fact, this finding was rooted in the myriad of undisputed documentary exhibits as well as the testimony by an abutter and the abutters' then-counsel. See Vita v. Berman, Devalerio & Pease, LLP, 81 Mass. App. Ct. 748, 755-756 (2012) (applying clearly

---

[16] The defendants primarily base their argument on their earlier contention that performance was excused by the Land Court judgment, which we have considered at length supra. Because we concluded that performance was not excused, we need not discuss the defendants' alternative argument that the "only other possible basis for a finding that [Pitsick] violated G. L. c. 93A was that it did not respond to the Abutters['] March 2016 demand letter under G. L. c. 93A."

20

erroneous standard when "reviewing a trial judge's conclusion that particular conduct was or was not unfair or deceptive").

"[C]onduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes" (quotations and citation omitted).  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991).  Here, the evidence supported the judge's conclusion that the defendants used the Land Court judgment to attempt to leverage a better deal for themselves from the abutters, who faced renegotiation or filing an action to enforce the agreement.  "[W]hen the breaching party uses its failure to make payments as a wedge against the other party to gain advantages . . . the breaching party's conduct rise[s] to the level of an unfair trade practice under G. L. c. 93A."  Zabin v. Picciotto, 73 Mass. App. Ct. 141, 170 (2008).

Finally, we discern no error in the interest award on the G. L. c. 93A claim.  Interest on a judgment of liability for a violation of G. L. c. 93A is subject to the statutory interest rate applicable to tort judgments.  See generally Greene v. Philip Morris USA Inc., 491 Mass. 866, 880-881 (2023).  The interest runs from the filing of the complaint even though this count was raised only in an amended complaint because the amended complaint relates back to the filing of the complaint.

21

See Mass. R. Civ. P. 15 (c), 365 Mass. 761 (1974).  See also Gill v. North Shore Radiological Assocs., Inc., 385 Mass. 180, 183 (1982).

Conclusion.  The judgment of the Superior Court is affirmed.  The abutters seek an award of appellate attorney's fees pursuant to G. L. c. 93A, § 9 (4), which we allow.  See Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 433 (2005).  Consistent with the requirements of Fabre v. Walton, 441 Mass. 9, 10 (2004), the abutters may file a request for appellate attorney's fees and costs, along with supporting documentation, within fourteen days of the issuance of the decision in this case.  The defendants shall have fourteen days thereafter within which to respond.

Judgment affirmed.

By the Court (Henry, Hand & Brennan, JJ.[17]),

*Paul Little*

Clerk

Entered:  November 18, 2025.

---

[17] The panelists are listed in order of seniority.

22