NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1240                                          Appeals Court


 ONEBEACON AMERICA INSURANCE COMPANY  vs.  NARRAGANSETT ELECTRIC
  COMPANY; AMERICAN HOME ASSURANCE COMPANY & others,[1] third-party
                       defendants (No. 1).


                       No. 13-P-1240.

        Suffolk.     June 3, 2014. - June 3, 2015.

        Present:  Kantrowitz, Hanlon, & Carhart, JJ.


Conflict of Laws.  Limitations, Statute of.  Practice, Civil,
     Summary judgment, Statute of limitations, Dismissal,
     Judicial discretion, Attorney's fees.  Insurance,
     Comprehensive liability insurance, Excess Liability
     Insurance, Construction of policy, Insurer's obligation to
     defend, Defense of proceedings against insured, Pollution
     exclusion clause, Disclaimer of liability.  Indemnity.
     Contract, Insurance, Indemnity, Construction of contract,
     Parties, Performance and breach.  Real Property,
     Environmental damage.  Jurisdiction.


_____

     [1] Century Indemnity Company; Certain Underwriters at
Lloyd's, London and Certain London Market Insurance Companies;
National Union Fire Insurance Company of Pittsburgh, PA
(National Union); John Does 1-200; American International
Specialty Lines Insurance Company (AISLIC); and Chartis
Specialty Insurance Company (Chartis).  During the course of the
proceedings below, AISLIC was succeeded by Chartis.  Subsequent
to the proceedings, American Home Assurance Company, Chartis,
and National Union were apparently succeeded by American
International Group, Inc.  For the sake of clarity, we refer to
the parties as their names appear in the pleadings.

Civil action commenced in the Superior Court Department on July 25, 2005.

Motions for summary judgment regarding choice of law issues were heard by Allan van Gestel, J., and a motion for reconsideration was considered by him; motions for summary judgment were heard by Margaret R. Hinkle, J., and Peter M. Lauriat, J.; the remaining issues were tried in two phases before them; and entry of final judgment was ordered by Lauriat, J.

Jay T. Smith, of the District of Columbia (A. Hether Cahill with him) for Narragansett Electric Company.
Kevin J. O'Connor for OneBeacon America Insurance Company.
David B. Chaffin for Century Indemnity Company.
Eileen T. McCabe, of New York, & John T. Harding, for Certain Underwriters at Lloyd's, London, & others, were present but did not argue.
Michael F. Aylward, for American Home Assurance Company & others, was present but did not argue.

KANTROWITZ, J. To put this rather dense environmental case in perspective, pollution in some of the affected areas started in the mid-1800s, and the first of several insurance policies at issue was written in 1945. Today, we are asked to rule on the propriety of the allowance of numerous summary judgment motions and the verdicts in three separate, lengthy jury trials.[2]

I. Background. The plaintiff, OneBeacon America Insurance Company (OneBeacon), brought this declaratory judgment action in July, 2005, against its insured, Narragansett Electric Company (NEC), seeking a determination that OneBeacon had no duty to

_____

[2] We also review the conversion of the voluntary dismissal without prejudice of certain of Narragansett Electric Company's counterclaims to a dismissal with prejudice.

defend or indemnify NEC for damages associated with environmental contamination at several sites, formerly utilized by NEC's predecessors for manufactured gas plant operations and waste disposal.  NEC counterclaimed for breach of contract and declaratory relief, adding other insurers that had issued primary and excess liability insurance policies to NEC for the years in question.

The majority of NEC's claims were dismissed on summary judgment as either time-barred or as not covered under the policies.  NEC appeals from those dismissals.  In the three jury trials, NEC prevailed on its remaining claims, against Century Indemnity Company (Century) and Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (collectively, London), who cross-appeal.  We affirm in part and reverse in part.

The issues before us are numerous and complex, involving Massachusetts procedure and Rhode Island substantive law.  The substantive aspects of the appeal and cross appeals are fact-intensive and involve Rhode Island law.  We address them by way of an unpublished memorandum and order pursuant to our rule 1:28, which accompanies this opinion.[3]  Our discussion here focuses principally on NEC's appeal from the denial of certain

---

[3] See OneBeacon America Ins. Co. v. Narragansett Elec. Co. (No. 2), 87 Mass. App. Ct.    (2015), issued this day.

claims as untimely under Massachusetts law.  We consider the issue of timeliness and the accrual of claims in the context of insurance coverage for environmental contamination.[4]

A.  The parties and policies.  NEC is a Rhode Island utility company with its principal place of business in Providence.  It is successor to the Blackstone Valley Electric Company (BVEC), and the Blackstone Valley Gas & Electric Company.[5]  The sites involved in this case were used by NEC's predecessors for manufactured gas plants and electric operations, and for waste disposal, from the mid-1800s until the 1980s.  Soil and groundwater contamination were eventually discovered at those sites, prompting governmental and private actions against NEC.  NEC sought defense costs and indemnification from a number of insurers that issued primary and excess policies to NEC for policy periods between 1945 and 1986.

OneBeacon, through its predecessors, issued thirteen primary comprehensive general liability policies to NEC, covering the period of October, 1972, to January 1, 1985.  These policies provided for defense costs and indemnification for

---

[4] The cross appeals also raise issues involving accrual in connection with one of the jury trials, which we address in our rule 1:28 memorandum and order.

[5] For the sake of clarity, we refer to the companies by their current name, NEC.

property damage in actions brought against the insured by third parties.

Predecessors of Century issued both primary and excess coverage to NEC.  The primary policy was for January 1, 1985, to January 1, 1986, and similarly provided for defense costs and indemnification.  The excess policies were for July 8, 1949, to May 1, 1965, and provided indemnification coverage in excess of retained limits as specified in the policies.  Excess policies were also issued by American Home Assurance Company (American Home), for June 1, 1973, to June 1, 1985,[6] and by London, for March 1, 1945, to June 1, 1968.

B.  The sites, response actions, and notices.  Of the eight involved sites, seven are located in Rhode Island; the remaining site is located in Massachusetts and Rhode Island.[7]  A Superior Court judge (first judge) divided the sites into two phases for litigation purposes.[8]

---

[6] AISLIC and National Union, related entities of American Home, issued pollution legal liability (PLL) policies to NEC as well.  Chartis is the successor to AISLIC.

[7] While we could speculate why redress was not sought in the State with the greatest number of affected sites, we do not.

[8] On November 19, 2007, the judge ordered the parties to select two or three sites "to be representative sites for the purposes of all further discovery and trial in the initial phase of this action."

1.  Phase I.  The parties jointly stipulated to the selection of the "Tidewater" and "Lawn Street" sites for Phase I.[9]

a.  Tidewater.  The Tidewater site is located in Pawtucket, Rhode Island, and was formerly used as a manufactured gas plant and power plant.  On October 28, 1986, the Rhode Island Department of Environmental Management (RIDEM) notified NEC that contaminated waste materials had been found at the site and requested that NEC construct a barrier to prevent public access to the contaminated area pending investigation.  In 1987, NEC forwarded the RIDEM correspondence to National Union Fire Insurance Company of Pittsburgh, PA (National Union), and Century.  On September 12, 1995,[10] RIDEM issued a "Letter of Responsibility" (LOR) to NEC, asserting that NEC was a responsible party for alleged releases of certain contaminants and demanding that NEC undertake a remedial investigative work plan at its own expense.  The LOR set forth enforcement actions and penalties for failure to comply.  NEC agreed to the LOR on

---

[9] A second Superior Court judge handled the motion practice with respect to the Phase I sites, and also presided over a jury trial concerning the existence and terms of six lost London policies.  In addition, she subsequently presided over a jury trial regarding the unresolved questions concerning the Lawn Street site.  A third Superior Court judge presided over a jury trial with respect to the issues not resolved by summary judgment for the Tidewater site.

[10] The reason for the lengthy delay is unclear.

September 22, 1995, and on April 17, 1996, NEC submitted a draft of the requisite plan to RIDEM.

On October 5, 1995, NEC notified OneBeacon, American Home, Century, and London of the Tidewater LOR and demanded defense costs and indemnification. On November 15, 1995, Century notified NEC that it could not find the 1985 policy and was reserving its rights. On December 27, 1996, American Home disclaimed coverage as to its excess policies that did not provide coverage for pollution legal liability (PLL). On June 14, 2001, American Home disclaimed coverage as to its PLL policies as well. On March 18, 1996, and again on October 14, 1998, OneBeacon disclaimed coverage, and on March 25, 1996, London disclaimed as to its duty to defend as an excess carrier, and reserved its rights as to indemnification.

b. Lawn Street. The second site selected, Lawn Street, is located partially in Attleboro, Massachusetts, and partially in Cumberland, Rhode Island, and was formerly a sand and gravel pit owned by a third party. NEC disposed sulfur-containing oxide box wastes from Tidewater at Lawn Street. On November 21, 1986, the Massachusetts Department of Environmental Quality Engineering (DEQE)[11] sent NEC a "Notice of Responsibility" (NOR)

---

[11] The Department of Environmental Protection is the successor agency to the Department of Environmental Quality Engineering. See St. 1989, c. 240, § 101.

pursuant to G. L. c. 21E, for the presence of contaminants at Lawn Street. In April, 1987, NEC notified OneBeacon of the NOR regarding Lawn Street. On October 23, 1987, NEC entered into an administrative consent order with DEQE that required NEC to prepare and implement site investigation plans. Subsequently, on September 13, 1996, NEC entered into an amended administrative consent order, agreeing to comply with the requirements of the Department of Environmental Protection (DEP) for remediating the site.

On February 29, 1996, NEC demanded coverage from American Home. On December 27, 1996, American Home disclaimed coverage as to its non-PLL policies and reserved its rights as to the PLL policies; on June 14, 2001, American Home disclaimed coverage under the PLL policies as well. On May 27, 1998, NEC notified OneBeacon of the amended administrative consent order for Lawn Street, and on October 14, 1998, OneBeacon disclaimed coverage.[12]

---

[12] On June 8, 2001, London disclaimed any duty to defend, as an excess insurer, and reaffirmed its reservation of rights regarding coverage. London eventually denied coverage based on its position that no covered event took place at Lawn Street during the policy period. On March 31, 1997, NEC sought a coverage determination from Century for Lawn Street. Century responded that it was investigating the claim under a reservation of rights.

2.  Phase II.  The Phase II sites are the Pawtucket water supply board (PWSB), Hamlet Avenue, J.M. Mills, High Street, Pond Street, and Exchange Street.[13]

a.  PWSB.  The PWSB site, located in Cumberland, Rhode Island, was a waste disposal site that received sulfur-containing oxide box waste from NEC that allegedly caused a release of hazardous substances.  On September 12, 1995, RIDEM sent NEC an LOR and demanded reimbursement of $296,381.70 for remediation.  On September 22, 1995, NEC agreed to comply by remitting the costs to RIDEM, pursuant to an escrow agreement whereby the funds were held pending resolution of related litigation.[14]  On October 5, 1995, NEC notified OneBeacon, American Home, Century, and London of RIDEM's claims and sought defense costs and indemnification for responding to the LOR.  On November 15, 1995, Century issued a reservation of rights, stating that it was trying to locate the relevant policies. OneBeacon disclaimed coverage on March 18, 1996, and again on

---

[13] The Davies Vocational School site was also litigated in Phase II.  NEC has not appealed from the dismissal of its claims for Davies Vocational School.  The third Superior Court judge handled the motion practice with respect to the Phase II sites.

[14] The escrow agreement provided that NEC would deposit the funds "to satisfy its obligations to the State pending resolution of the issue of whether FFC [ferric ferrocyanide] is a hazardous substance" under State and Federal law, which NEC was litigating in a related matter.

October 14, 1998.  On March 25, 1996, London notified NEC that it had no duty to defend under the excess policies, and reserved its rights as to any indemnification obligations.  On December 27, 1996, American Home denied coverage based on its policy's "pollution exclusion" provision, and again declined coverage on June 14, 2001.

b.  <u>Hamlet Avenue</u>.  The Hamlet Avenue site, located in Woonsocket, Rhode Island, was used by NEC as a manufactured gas plant and power plant.  Soil and groundwater contamination were found at the site, and on February 11, 1997, RIDEM issued an LOR to NEC, directing NEC to develop a site investigation plan.  On February 21, 1997, NEC notified OneBeacon, American Home, Century, and London, and sought defense costs and indemnification.  On February 25, 1997, NEC settled with RIDEM, agreeing to pay for the work specified in the LOR, but did not notify the insurers.  Century responded on April 7, 1997, reserving its rights.  Also on April 7, 1997, London informed NEC that it had no duty to defend under the excess policies and reserved its rights as to any obligation to indemnify.  On October 14, 1998, OneBeacon disclaimed coverage, and on June 14, 2001, American Home disclaimed coverage as well.[15]

---

[15] Chartis (as successor to AISLIC) was also notified of the LOR on February 21, 1997, and disclaimed coverage on November 24, 1997.

c. <u>J.M. Mills</u>. J.M. Mills is a former landfill located in Cumberland, Rhode Island. Between 1967 and 1982, NEC hired a contractor to carry waste from one of its facilities to J.M. Mills, which was owned by a third party. The waste included creosote-covered utility poles. In 2000, the Environmental Protection Agency (EPA), in the course of investigating contamination at J.M. Mills, issued a "Request for Information" (RFI) to NEC. On May 28, 2004, EPA identified NEC as a potentially responsible party (PRP), and informed NEC that it was liable for past and future cleanup costs. NEC sought coverage from OneBeacon, Century, London, and American Home for expenses in connection with the cleanup of the site. All of the insurers disclaimed coverage, based either on the pollution exclusion provisions in their policies, or on the basis that no triggering event occurred during the policy period.

d. <u>High, Pond, and Exchange Streets</u>. The final three sites are referred to as High Street, Pond Street, and Exchange Street, located in Central Falls, Woonsocket, and Pawtucket, Rhode Island, respectively. When BVEC merged into NEC in 2000, NEC notified RIDEM of the prior use of those sites as manufactured gas plants. NEC also notified the insurers on April 5, 2000, of the potential for governmental claims

regarding cleanup of these sites and included the sites in its counterclaims.[16]

C. Prior proceedings. OneBeacon filed this action in Superior Court on July 25, 2005, seeking a declaration that it has no duty to defend or indemnify NEC for environmental contamination claims under the thirteen comprehensive general liability insurance policies issued to NEC between 1972 and 1985. On September 14, 2005, NEC counterclaimed against OneBeacon for breach of contract and declaratory relief. On cross motions for summary judgment, the first Superior Court judge ruled that Rhode Island substantive law would apply in interpreting the policies. The second judge determined that Massachusetts's six-year statute of limitations would apply to the claims, rather than Rhode Island's ten-year statute of limitations. On October 12, 2007, NEC amended its counterclaim, adding the other insurers involved in this appeal, and subsequently filed a second amended counterclaim on July 13, 2009, adding additional insurers and claims, including a claim against AISLIC for defense costs, and against Century for breach of its 1985 primary policy.

On the Phase I claims, summary judgment entered for OneBeacon and American Home on statute of limitations grounds

---

[16] RIDEM had yet to take action with respect to these three sites at the time of the final hearing in these proceedings.

with respect to both Tidewater and Lawn Street.[17]  On the same basis, summary judgment entered for Century on NEC's duty to defend claim as to Tidewater, but NEC's claims against Century and London for indemnification were tried to a jury, which found for NEC.  As to Lawn Street, summary judgment entered for London and American Home (see note 17, supra) on their duty to indemnify, on the ground that no triggering event had occurred during the policy period.  NEC's claims against Century for the Lawn Street site went to trial, with a jury verdict for NEC.[18]  NEC also prevailed in a third trial to establish the terms of six lost policies issued by London.

In the Phase II proceedings, summary judgment entered for all insurers on NEC's claims for PWSB and Hamlet Avenue, on statute of limitations grounds.  As to J.M. Mills, summary judgment entered for OneBeacon, Century, and American Home based on the pollution exclusion clauses in their policies; summary judgment entered for London (as it had on the Lawn Street claims) on the basis that no triggering event had occurred during the policy period.  NEC moved to voluntarily dismiss its

---

[17] As to Lawn Street, summary judgment entered for American Home for the additional reason that no triggering event had occurred during the policy period.

[18] At the beginning of the Lawn Street trial, Century waived its statute of limitations defense as to the duty to defend, and trial proceeded on the indemnification claims.

claims for High Street, Pond Street, and Exchange Street. The motion was allowed, conditioned on NEC's paying the insurers' attorney's fees related to those claims. When the parties failed to agree on how to proceed as to the fee request, the judge dismissed the claims with prejudice, omitting the fee award.

We address in this opinion NEC's appeal from the summary judgment rulings dismissing its claims as time-barred. We also address NEC's appeal from the dismissal, with prejudice, of its claims for High Street, Pond Street, and Exchange Street.[19]

II. <u>Issues on appeal</u>. A. <u>Statute of limitations</u>. NEC argues that the judge erred in applying Massachusetts's six-year statute of limitations rather than Rhode Island's ten-year period, and that, in any event, its claims were not time-barred under either provision.

1. <u>Choice of law</u>. Massachusetts provides a six-year limitations period, under G. L. c. 260, § 2, for breach of contract claims, while Rhode Island provides a ten-year limitations period, under R.I. Gen. Laws § 9-1-13. The forum

---

[19] In our accompanying rule 1:28 memorandum and order, we address Century and London's cross appeals from certain rulings made by the trial judges at their respective jury trials (concerning the Phase I sites and the six lost London policies), as well as NEC's appeal from the allowance of various insurers' summary judgment motions on other than statute of limitations grounds (concerning J.M. Mills and Lawn Street).

State applies its own conflict of law rules in determining which State's law governs. See Clarendon Natl. Ins. Co. v. Arbella Mut. Ins. Co., 60 Mass. App. Ct. 492, 495 (2004). In resolving a question involving the statute of limitations, Massachusetts utilizes the choice of law analysis set forth in Restatement (Second) of Conflict of Laws § 142 (Supp. 1989).[20] Nierman v. Hyatt Corp., 441 Mass. 693, 695 (2004), citing New England Tel. & Tel. Co. v. Gourdeau Constr. Co., 419 Mass. 658, 663-664 (1995). Where, as here, the forum State has the shorter statute of limitations, which bars the claim, we apply § 142(1) of the Restatement, pursuant to which Massachusetts's six-year statute of limitations governs NEC's claims, unless exceptional

---

[20] Section 142 of the Restatement provides:

"Whether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6. In general, unless the exceptional circumstances of the case make such a result unreasonable:

"(1) The forum will apply its own statute of limitations barring the claim.

"(2) The forum will apply its own statute of limitations permitting the claim unless:

"(a) maintenance of the claim would serve no substantial interest of the forum; and

"(b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence."

circumstances make the result unreasonable. Shamrock Realty Co. v. O'Brien, 72 Mass. App. Ct. 251, 255-256 (2008). NEC has identified no reason why Rhode Island was not available as an alternative forum or why it would have been "extremely inconvenient" to bring its claims there. See id. at 257. Specifically noting that NEC could have brought its claims in Rhode Island rather than awaiting OneBeacon's filing suit,[21] the judge properly ruled that Massachusetts's six-year statute of limitations for contract actions applied.

NEC asserts that the choice-of-law principles of Restatement (Second) of Conflict of Laws § 6 (1971), referenced in the first sentence of § 142, require a different result from that provided in § 142(1).[22] However, we interpret § 142(1) to

_____

[21] Indeed, even after OneBeacon filed suit in 2005, NEC could have filed a suit in Rhode Island and sought dismissal of the OneBeacon Massachusetts case. As we have noted, seven of the eight sites at issue were located in Rhode Island.

[22] The factors listed in Restatement (Second) of Conflict of Laws § 6(2) (1971) are:

"(a) the needs of the interstate and international systems,

"(b) the relevant policies of the forum,

"(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

"(d) the protection of justified expectations,

be consistent with the § 6 factors when the law of the forum State would bar the claim.  See New England Tel. & Tel. Co. v. Gourdeau Constr. Co., 419 Mass. at 664 n.6 ("[t]he balance of § 142 seems to set forth the way in which the principles of § 6 will be implemented"); Shamrock Realty Co. v. O'Brien, 72 Mass. App. Ct. at 256, quoting from Restatement (Second) of Conflict of Laws § 142 comment f (Supp. 1989) (the forum State "has a substantial interest in preventing the prosecution in its courts of claims which it deems to be 'stale'").  Moreover, NEC's interpretation would impermissibly render all but the first sentence of § 142 superfluous.  Cf. Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594, 601 (2010) (statute should not be interpreted to leave any part inoperative or superfluous).

2.  Accrual.  NEC alternatively argues that its claims were timely because they accrued within the six-year limitations period.  As mentioned, NEC's counterclaims against OneBeacon were brought in September, 2005, while most of its claims against the other insurers were brought in 2007, and still

---

"(e) the basic policies underlying the particular field of law,

"(f) certainty, predictability and uniformity of result, and

"(g) ease in the determination and application of the law to be applied."

others in 2009.  We examine the history of dealings between NEC and the insurers to determine when NEC's claims accrued and, thus, whether the motion judges erred in determining that certain claims were time-barred.

The statute of limitations for a claim for breach of an insurance policy, as in a contract action generally, begins to run on the date of the insurer's alleged breach.  See Berkshire Mut. Ins. Co. v. Burbank, 422 Mass. 659, 661 (1996).  Under this rule, NEC's claims accrued when the insurers failed or refused to pay defense and indemnity costs under the policies.  See id. at 663 n.5.  An action for breach of an insurance policy, like an action in tort, however, may be tolled until the insured discovers the facts giving rise to its claim.  Szymanski v. Boston Mut. Life Ins. Co., 56 Mass. App. Ct. 367, 370 (2002). "When . . . the parties press different events as triggering accrual, the factual inquiry focuses on which was the first event reasonably likely to put the plaintiff on notice that the defendant's conduct had caused him injury."  Id. at 371.  NEC and the insurers disagree as to the nature and extent of the injury that should have alerted NEC to its claims.

a.  Duty to defend.  NEC appeals from the summary judgment decisions of the second judge for OneBeacon and Century as to Tidewater, and from the decision of the third judge for both

insurers as to Hamlet and PWSB.[23]  The primary policies, issued by OneBeacon and Century, provided that the insurers had the "right and duty to defend" suits against the insured.  NEC's initial counterclaim, filed in 2005, asserted that OneBeacon had a duty to defend.  It was not until NEC's second amended counterclaim, filed in 2009, that NEC asserted that Century also had a similar duty to defend.  NEC's claims for breach of the duty to defend accrued when its demand to the insurers for costs associated with defending the claims was refused, and NEC began to incur such costs.  See Siebe, Inc. v. Louis M. Gerson Co., 74 Mass. App. Ct. 544, 558 (2009) (limitations period for breach of duty to defend begins to run when insured is sued, insurer refuses to defend, and insured begins to incur defense costs). See also Berkshire Mut. Ins. Co. v. Burbank, 422 Mass. at 662 (action against insurer accrued when it refused to arbitrate plaintiff's claim); Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co., 46 Mass. App. Ct. 209, 214 (1999) (assuming insurer's disclaimer violated duty to defend, insured required to bring action to recover defense costs within six years from the disclaimer); John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F. Supp. 2d 77, 102-103 (D. Mass. 1999).  The judges properly

---

[23] NEC also brought a claim for defense costs against one excess insurer (AISLIC), which is not at issue on appeal.

ruled that NEC's claims for defense costs were time-barred based on the dates it received the insurers' disclaimers.[24]

NEC urges that its duty to defend claims should be governed by the majority rule, which requires resolution of the underlying litigation against the insured before a claim for breach of the duty to defend accrues.  See, e.g., Dutton-Lainson Co. v. Continental Ins. Co., 271 Neb. 810, 825-828 (2006), and cases cited; 17 Couch, Insurance § 236:102 (3d ed. 2000) (citing rule that underlying judgment triggers accrual of action for refusal to defend but acknowledging authority to the contrary).  A primary reason cited for waiting until the underlying litigation concludes is to ascertain the extent of the insured's defense costs.  See, e.g., Brannon v. Continental Cas. Co., 137 P.3d 280, 285 n.20 (Alaska 2006).  Massachusetts, however, does not follow the majority rule.  Here, certainty as to the amount of a plaintiff's claim is not a prerequisite to accrual of a breach of contract claim.  See, e.g., International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215, 221 (1990) (breach of contract claim accrued when

_____

[24] As we have noted, OneBeacon disclaimed coverage as to Tidewater and PWSB on March 18, 1996, and again on October 14, 1998; Century reserved its rights on November 15, 1995.  As to Hamlet, OneBeacon disclaimed coverage on October 14, 1998, and Century reserved its rights on April 7, 1997.  NEC's claim for coverage from OneBeacon was filed in September, 2005; its counterclaim against Century for a duty to defend was not filed until July, 2009, in the second amended counterclaim.

insurance agent failed to procure insurance policy, not later date, after trial of underlying negligence claim against insured). See also DiGregorio v. Commonwealth, 10 Mass. App. Ct. 861, 862 (1980). Therefore, accrual of an action for defense costs is not postponed until their full extent can be determined.

NEC additionally argues that accrual should be tolled because the duty to defend is a continuing obligation, which the insurer might cure by the litigation's conclusion. See Vigilant Ins. Co. v. Luppino, 352 Md. 481, 492 (1999). In Massachusetts, however, the possibility that the insurer might eventually cure the breach does not affect accrual once the breach occurs. See, e.g., International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. at 221, citing DiGregorio v. Commonwealth, 10 Mass. App. Ct. at 862 (rejecting plaintiff's argument that accrual should be tolled until condition defendant required for payment of damages was fulfilled so that plaintiff could ascertain whether defendant would make any payment). Contrast Lumbermens Mut. Cas. Co. v. Y.C.N. Transp. Co., 46 Mass. App. Ct. at 214-215 (by making partial payment after first disclaiming coverage and after statute of limitations had run, insurer waived the limitations defense). Accordingly, we decline to follow those jurisdictions that require resolution of

the underlying litigation before the insured's claim for breach of the duty to defend accrues.[25]

NEC further complains that the judges wrongly treated Century's reservation of rights as a disclaimer of Century's duty to defend regarding claims against NEC for environmental pollution at Tidewater, Hamlet, and PWSB. Century reserved its rights for Tidewater and PWSB on November 15, 1995, and for Hamlet on April 7, 1997, but then failed to make a decision for a number of years, even as NEC incurred costs.[26]

We agree with the judges that Century's failure to render a decision on NEC's request for a defense, despite the significant passage of time, constituted a breach that triggered the statute of limitations at some point well before 2003. As one of the

---

[25] We also reject NEC's reliance on the "no action" provision in some of the policies as a basis to postpone accrual until judgment enters in the underlying action. The typical provision here provided, in relevant part, that "[n]o action shall lie against the [insurer] . . . until the amount of the Insured's obligation to pay shall have been finally determined either by judgment . . . or by written agreement." See, e.g., Ratner v. Canadian Universal Ins. Co., 359 Mass. 375 (1971). There, although the insurer argued the claim against it was premature under the policy's "no action" provision, the court held that an insurer that "without right has refused to defend an action against its insured no longer can insist upon the case being carried to judgment against the insured." Id. at 379, quoting from Berke Moore Co. v. Lumbermens Mut. Cas. Co., 345 Mass. 66, 70 (1962). See John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F. Supp. 2d at 101-103.

[26] Indeed, for all that appears, Century never made a formal disclaimer of its duty to defend.

judges explained, the time needed for the insurer to make a determination regarding its duty to defend "required no more than a comparison of the LOR against the terms of the 1985 policy." See Siebe, Inc. v. Louis M. Gerson Co., 74 Mass. App. Ct. at 548, 558 (claim accrued when insured sent insurer notices of underlying lawsuits, and insurer failed to reply to notices). See also DiGregorio v. Commonwealth, 10 Mass. App. Ct. at 862; Felton v. Labor Relations Commn., 33 Mass. App. Ct. 926, 927-928 (1992) (plaintiff's claim barred where he waited ten months, without inquiry, for union's response to his request to file grievance); Epstein v. C.R. Bard, Inc., 460 F.3d 183, 187-188 (1st Cir. 2006) (statute of limitations was not tolled pending defendant's reply to plaintiff's letter inquiring whether defendant was improperly using his technology).

    b. Duty to indemnify. Accrual of NEC's claims for breach of the insurers' duty to indemnify involves somewhat different considerations. The policies required the insurers to indemnify NEC for amounts that NEC became legally obligated to pay as damages, because of property damage, in actions brought against it by third parties.[27] Thus, NEC's claims against the insurers accrued when the insurers breached that duty, by failing or

---

[27] The language of the policies differs slightly, some referring to the insured's legal obligation or loss the insured is legally obligated to pay, others to the insured's liability arising from a claim against it or imposed by law.

refusing to pay environmental response costs that NEC became legally obligated to pay. See Berkshire Mut. Ins. Co. v. Burbank, 422 Mass. at 663 n.5 (collecting cases).

NEC urges that its cause of action did not accrue until its legal obligation to pay environmental damages was established through adjudicatory proceedings, whether by judgment, settlement, or other binding determination. See, e.g., John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F. Supp. 2d at 103 (reasoning, inter alia, that underlying lawsuit against insured might determine that insured was not liable). See also 17 Couch, Insurance § 236:17 (3d ed. 2000) (claim under commercial policy covering legal liability of insured accrues upon rendering of judgment against insured). While we understand the argument, we think a legal obligation imposed by a governmental agency, pursuant to an environmental statute, is different. The insured's liability for remediation in such instances may be determined long before final judgment. Indeed, given the public interest in a prompt response to environmental hazards, the insured's legal obligation for the expenses may arise without any litigation at all.

In Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 693-697 (1990), for example, a letter from the EPA was deemed the equivalent of a lawsuit, for purposes of establishing a duty to defend. In that case, the insured was

required to respond to the EPA's assertion that releases of hazardous substances were occurring at a facility where the insured had sent solvents for recycling.  The EPA letter, while seeking the insured's voluntary participation, essentially required the insured's commitment to all measures needed to remediate the site, and advised of penalties for failure to cooperate.  In the court's view, "It would be naive to characterize the EPA letter as a request for voluntary action." Id. at 697.  Given the statutory powers available to the EPA, "[t]he prospects of avoiding financial responsibility were minimal because liability is not based on fault," and available defenses were few.  Id. at 696-697.  The obligation to pay response costs was imposed pursuant to the statutory authority granted to the agency, and required no lawsuit -- in fact, none had been filed.

> "[T]he EPA processes for the enforcement of obligations to aid in the cleaning up of environmental pollution have moved away from the use of lawsuits toward the use of agency demands for participation in remedial action.  Those requests are dangerous for the alleged polluter to ignore because they often result in dispositive, extrajudicial solutions."

Id. at 695-696.

Applying those same principles to the duty to indemnify, in Employers' Liab. Assur. Corp. v. Hoechst Celanese Corp., 43 Mass. App. Ct. 465, 482-483 (1997), we reasoned that the excess insurers' duty to indemnify the insured for liability "imposed

upon the Insured by law," as the policies provided, was triggered when an environmental agency sought response actions from the insured; formal litigation was not required.[28]  As this court explained, "It is hard to see what public interest would be promoted by having an insured deliberately await, or even actively encourage, formal litigation by an environmental agency in order to make sure that the insured's right of indemnification would not be compromised."  Id. at 483.  Compare Wilkinson v. Citation Ins. Co., 447 Mass. 663, 671 (2006) (in usual case of insurer indemnification for property damage, "[t]he element of time is less critical").

Taking all of these considerations into account, we conclude that for purposes of accrual, NEC's legal obligation was established when the respective governmental agencies imposed essentially mandatory requirements that NEC take action. Neither litigation nor final resolution was necessary, in this context, to impose liability for purposes of accrual of NEC's indemnification claims against the insurers.

NEC additionally argues that its costs incurred prior to the mid-2000s were purely investigative, rather than remedial,

---

[28] As to the contrary view, that the insurers' duty would only be triggered by "a lawsuit or similar compulsory proceeding," Justice Kaplan observed, "In a superficial view, this seems incorrect, for we regularly speak of the existence of legal liabilities although they have not been and are not being established by actual litigation."  43 Mass. App. Ct. at 482.

and so implicated only the accrual of its claims for breach of the insurers' duty to defend, not their duty to indemnify. See, e.g., American Bumper & Mfg. Co. v. Hartford Fire Ins. Co., 452 Mich. 440, 460-461 (1996) (distinguishing investigation costs that go toward remediation from those aimed at limiting insured's liability, which are treated as defense costs). However, as the second judge observed, NEC claimed the right, in its answers to interrogatories, to recover all costs incurred at the sites, for both investigation and remediation, as indemnification costs. Moreover, NEC's response actions took a remedial turn long before the accrual dates for its indemnification claims against the insurers. For Tidewater, that happened when NEC agreed to the LOR on September 22, 1995, and incurred associated costs as of April, 1996, for submitting and implementing a remedial investigative work plan to address the environmental releases. For Lawn Street, NEC's legal liability for damages was established when it entered into the amended administrative consent order with DEP on September 13, 1996, agreeing to conduct all necessary response actions. With regard to Hamlet, NEC responded to the LOR on February 25, 1997, by agreeing to pay for the remediation. And at PWSB, NEC responded to the LOR in September, 1995, by agreeing to comply with RIDEM's request to remit the remediation costs, and

depositing the funds in escrow pending the outcome of related litigation.[29]  See note 14, supra.

NEC also complains that the third judge erred in ruling that the reservation of rights letters issued by Century and London, for PWSB and Hamlet, amounted to disclaimers by the time NEC's claims for indemnification accrued in October, 2001.[30] Century reserved its rights in 1995 and 1997 for PWSB and Hamlet, respectively, and London reserved its rights in 1996 and 1997, for PWSB and Hamlet, respectively.  The judge, relying on the duty to defend analysis in Siebe, Inc. v. Louis M. Gerson Co., 74 Mass. App. Ct. at 558, reasoned that the insurers' delay in failing to provide an affirmative response to NEC's demand for coverage, combined with the fact that NEC began to incur response costs at those sites, constituted a breach of contract sufficient to trigger the statute of limitations for NEC's indemnification claims.

---

[29] NEC argues that its liability for cleanup at PWSB was not established until 2003, when it agreed to fund the remediation, and that placing the funds in escrow pending the outcome of its litigation as to whether the material removed from the site by RIDEM was a "hazardous substance" under Federal or State law did not establish liability.  But we view the requirement that NEC escrow the funds, in order to comply with RIDEM's demand, as a legal obligation triggering accrual of its claim, regardless whether the funds might ultimately be returned to NEC.  See, e.g., DiGregorio v. Commonwealth, 10 Mass. App. Ct. at 862.

[30] The judge incorrectly characterized London's response to NEC's notices regarding those sites as a denial of coverage, and London appears to concede the point.

Our review of the summary judgment record leads us to conclude otherwise. We think a question of fact exists as to whether the insurers' failure to make coverage determinations with respect to Hamlet and PWSB constituted disclaimers of their duty to indemnify prior to October, 2001. To begin, unlike the duty to defend, an insurer's determination of its duty to indemnify depends on actual facts, rather than allegations, and reasonably might require more time to investigate. See, e.g., Employers Mut. Cas. Co. v. PIC Contractors, Inc., 24 F. Supp. 2d 212, 217 (D.R.I. 1998). Moreover, correspondence and deposition testimony in the record indicate that Century and London continued to communicate with NEC concerning PWSB and Hamlet after the initial reservation of rights letters were issued. A July 14, 1999, letter from London to NEC requested additional information to evaluate NEC's claims for Hamlet and PWSB, and a June 8, 2001, letter from London requested an itemization of costs already incurred as well as a "site-by-site estimate" for expected future costs for all NEC sites. Deposition testimony from a Century representative suggested that Century, as well, may have continued to communicate with NEC regarding the sites after issuing its initial reservation of rights.[31] Construing

---

[31] In the case of Century's response regarding PWSB, a Century representative testified that while there was no written correspondence in the file between 1995 and 2002, there may have been telephone calls and other verbal communication, "which I

the evidence and reasonable inferences in favor of NEC, the nonmoving party, the insurers' conduct suffices to raise a question of fact as to whether Century and London's responses to NEC's indemnification claims for PWSB and Hamlet constituted disclaimers prior to 2001.

We note that the same judge presided at the trial for the Tidewater site, which involved NEC's indemnification claims against Century and London and took place almost a year before the judge ruled in their favor on NEC's indemnification claims for PWSB and Hamlet.  At the Tidewater trial, the question whether Century and London's reservation of rights letters and subsequent conduct constituted disclaimers prior to 2001 was put to the jury on similar facts.  We discern no basis for the divergent rulings and conclude that the summary judgment record raises an issue of material fact as to whether Century and London disclaimed their duty to indemnify NEC for PWSB and Hamlet; the matter should not have been decided as a matter of law on summary judgment.

B.  <u>Dismissal with prejudice</u>.  On February 4, 2011, after prosecuting its claims against the insurers for over five years, NEC moved to voluntarily dismiss its claims, pursuant to

---

would have expected in the ordinary course of business," and that Century had continuously indicated to NEC that it was still gathering information.  As for the Hamlet Avenue site, the same Century representative testified in 2010 that "we are continuing to investigate the site at this point."

Mass.R.Civ.P. 41(a)(2), 365 Mass. 803 (1974), for High Street, Pond Street, and Exchange Street. Although NEC had anticipated RIDEM involvement at those sites, no such action was forthcoming, and thus there existed no claim under the policies and no justiciable controversy. In an order issued in February, 2012, the third judge, who heard the motion, conditioned the allowance of NEC's request for dismissal without prejudice upon NEC's payment of the insurers' reasonable costs and attorney's fees in responding to those claims. At a hearing held one month later, the parties reported that they had not reached agreement on how to proceed; as a result, the insurers had not yet submitted their fee request. Thereupon, in the interest of "mov[ing] this case on," the judge dismissed the claims with prejudice and omitted the award of attorney's fees.

On appeal, NEC argues that the claims should have been dismissed without prejudice, correctly observing that because the claims presented no justiciable controversy, the court lacked subject matter jurisdiction to enter an order of dismissal with prejudice. See Department of Community Affairs v. Massachusetts State College Bldg. Authy., 378 Mass. 418, 422 (1979) (court's subject matter jurisdiction limited to cases involving an actual controversy); Linehan v. Linehan, 453 Mass. 1017, 1017-1018 (2009) (until claim became ripe, it did not meet

jurisdictional threshold of an actual controversy; dismissed without prejudice).

In entering the order of dismissal without prejudice, conditioned on NEC's paying the defendants' attorney's fees, the judge relied on rule 41(a)(2), which provides that voluntary dismissal be allowed "upon such terms and conditions as the court deems proper."  See Quest Sys., Inc. v. Zepp, 28 Mass. App. Ct. 489, 494 (1990) (award of attorney's fees "not unusual where dismissal is without prejudice").  However, Mass.R.Civ.P. 12(h)(3), 365 Mass. 754 (1974), requires that "[w]henever it appears by suggestion of a party or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  The rule makes no mention of terms and conditions that may attach to dismissal when subject matter jurisdiction is lacking.  In fact, this court has held that dismissal for lack of subject matter jurisdiction, even if labelled "with prejudice," will not bar a subsequent action by the plaintiff on the same claim.  Department of Rev. v. Ryan R., 62 Mass. App. Ct. 380, 383 (2004), citing Restatement (Second) of Judgments § 20 comment d (1982).  See also Mass.R.Civ.P. 41(b)(3), as amended, 454 Mass. 1403 (2009).[32]

---

[32] Rule 41(b)(3) provides, in relevant part, that "any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, . . . operates as an adjudication upon the merits."

We recognize that the Superior Court judge possessed inherent power to manage his case load and enforce his lawful orders, even in a manner not specifically authorized by the rules. See Sommer v. Maharaj, 451 Mass. 615, 621 (2008). But even assuming, without deciding, that such power may be exercised in the course of complex litigation when subject matter jurisdiction over a particular claim is lacking, NEC's conduct here did not warrant dismissal with prejudice. The court's inherent power is to be exercised with restraint and discretion, with the extreme sanction of dismissal with prejudice reserved for extreme misconduct. Id. at 621-622. Here, the hearing transcript suggests that NEC was not recalcitrant in failing to pay the insurers' fees but, rather, was awaiting information from the insurers regarding the amount of their fees. Indeed, at the March, 2012, hearing, the judge acknowledged, "[T]hat's fine. I appreciate you tried." We agree with NEC that the judge's decision to dismiss its claims with prejudice in order to "move this case on" was not warranted.

A question remains whether the judge had authority to order that NEC pay the insurers' attorney's fees as a condition of dismissal without prejudice, when the court lacked subject

matter jurisdiction over the claims.[33]  We think not.  In Quest
Sys., Inc. v. Zepp, supra, relied upon by the insurers, this
court ordered dismissal without prejudice, with imposition of
attorney's fees at the judge's discretion.  28 Mass. App. Ct. at
498.  However, that case did not implicate the trial court's
subject matter jurisdiction.  Again, Mass.R.Civ.P. 12(h) does
not authorize the imposition of terms or conditions in the order
of dismissal in this instance, and the record does not justify
the fee award as a sanction for misconduct.  NEC's claims
involving High Street, Pond Street, and Exchange Street are
therefore to be dismissed without prejudice.

    III.  Conclusion.  It was error to grant summary judgment
(a) in favor of Century and London on statute of limitations
grounds with respect to their duty of indemnification for Hamlet
Avenue and PWSB; and (b) in favor of OneBeacon, Century, and
American Home with respect to the application of the pollution
exclusion provisions in their policies covering the J.M. Mills
site.  Accordingly, we reverse so much of the final judgment and
declaratory decree as (a) declares that Century and London have
no duty to indemnify NEC with respect to claims or liabilities
at Hamlet Avenue and PWSB and dismisses those claims; and (b)
declares that OneBeacon and Century have no duty to defend or

_____

    [33] NEC does not raise the point, but we address it, in
accordance with Mass.R.Civ.P. 12(h)(3).

indemnify, and American Home has no duty to indemnify, NEC with respect to claims or liabilities at J.M. Mills and dismisses those claims.  We vacate so much of the final judgment and declaratory decree as dismisses with prejudice NEC's claims as to High Street, Pond Street, and Exchange Street, and the judgment shall be modified to dismiss those claims without prejudice.  In all other respects, the final judgment and declaratory decree is affirmed.  The orders denying Century's motion for judgment notwithstanding the verdict (JNOV) or new trial, London's motion for JNOV, and London's motion for new trial and to alter or amend the judgment are affirmed.

So ordered.